SHIELDS *vs.* LOZEAR. LOZEAR *vs.* SHIELDS.

1. The defence of incapacity to contract—*held*, in this case, to be unsupported by the proofs.

2. Tender of the amount due on the mortgage, after its maturity and acceptance refused by the mortgagee in possession—*held*, in this case, on bill to redeem, to entitle the complainant to a decree with costs.

3. The effect of a tender lawfully made is to discharge the debtor from subsequent interest and costs. But, to have this effect, the amount tendered must be kept in readiness, and, on bill to redeem, or on plea or answer

setting up tender, the money must be paid into court. No less strictness is required in such cases in equity than at law.

4. Differences among the authorities as to the meaning of the term "readiness to pay."

5. The mortgagee in possession held to account for rents, at the rate agreed on between the parties during the year prior to the maturity of the mortgage.

The two causes were argued together, upon the pleadings and proofs, before the Vice-Chancellor, to whom the same had been referred.

*Mr. Vanatta,* for complainant.

*Mr. J. G. Shipman,* for defendant.

THE VICE-CHANCELLOR.

On the 9th of April, 1867, Samuel M. Lozear and wife conveyed their dwelling-house and lot, in Hackettstown, to Thomas Shields, jun., for $7000, and for part of the price took back a mortgage for $4000, payable on the 1st day of April, 1868. He then took a lease for the term ending on the last named day: the rent being the interest, at seven per cent. yearly on the price, together with the payment of the taxes and water rents, when due. A year's interest, to accrue on the mortgage, was then credited in advance on the bond, and the balance of the price was secured by promissory notes, without interest, and payable at the end of the term in the lease.

On the 1st day of April, 1868, Shields failed to make tender of the principal of the mortgage, but afterwards made tender of it, and of the interest accrued. Its acceptance was refused by Lozear, when Shields brought an action of ejectment, in the Supreme Court, for the possession of the premises, by virtue of his deed. In this action the mortgage was set up in defence, and judgment given in that court for defendant, and by the Court of Errors affirmed, on the ground that tender made after day of payment named

in the bond, did not terminate or extinguish the defendant's right to hold under the mortgage.

A bill to redeem was then filed by Shields, and an answer and cross-bill by Lozear. His answer and cross-bill set up his incapacity to contract. They allege that from July, 1864, to March, 1868, he was deprived of his reason, his judgment, and his will, to such an extent as to disable him from executing a contract or deed, or making sale of his land. The object of the cross-bill is to have the sale and conveyance annulled, and the deed, mortgage, and other papers growing out of the transactions, decreed to be void. The two causes were argued together.

At the time of the transactions, Lozear was a blacksmith, working at his trade; was turned of middle life; industrious and active, and a member of the Methodist Church. A difficulty with a fellow member of the church in 1864, is shown to have excited and disturbed him. His temperament is proved to have been irritable and nervous. He talked of selling his place and moving away. The premises where he lived adjoined those of Shields, who, on that account, was desirous to buy. In 1865, or thereabouts, they had negotiated for a sale. Lozear then offered the property to Shields for $5500, which was agreed to be given, but no writing was signed; and Lozear afterwards stating that his wife was unwilling to give up the property without $500 more being paid for it, the matter was dropped. Shortly prior to the 17th of September, 1866, he was offered by Caleb H. Valentine $2000 for the vacant part of the property, which offer he declined, assigning as the reason that he wanted to sell the whole and move on a farm. He offered to take $7000 for the whole. This was the price he had fixed upon and was then seeking to get. He talked of it with Andrew J. Winter, who worked with him daily in his shop, and offered him $50 to find a purchaser at that price. He said to this witness on quitting work at the end of the day, that he was going to see Shields and give him the refusal of the property, and if he didn't take it he had

another man who would. The next morning he told Winter he had sold it to Shields, and gave him the particulars of the bargain. On the evening of the 17th of September, 1866, he did go to Shields, who did not expect him, and had no notice of his coming. He told him he had come to sell the property; that his folks had talked the matter over and were perfectly willing, provided he got his price; that $7000 was the lowest; that he would have an article drawn and take money on it. The terms of payment were then agreed on and the bargain concluded. Col. Valentine, who was sitting on the porch of the store, was called in and asked to draw the agreement, which he did. It was read over by him to Lozear, who signed it, and received $50 on account of the price. · The agreement called for the delivery of the deed on the 1st of April then next, a mortgage for $4000, and approved notes for the balance. Several weeks after the agreement, Lozear took to Col. Valentine two deeds describing the property, and asked him to draw the conveyance to Shields; told him that his wife was becoming dissatisfied with the sale; that he wanted the deed executed before trouble arose, and would try to get Shields to close it at once. Col. Valentine accordingly took up the deed to be signed by Mrs. Lozear, who refused. On the 9th of April, 1867, the papers were executed, as stated above. The lease was then given at Lozear's request. During 1866–'67–'68, he worked regularly at his trade, with occasional interruptions when sick, kept his accounts, collected his bills, and settled with his customers. He several times told Winter of the discontent of his wife, and once that his family wanted him to plead crazy to hold on to the property.

It is unnecessary to review, or even to refer to the evidence of the numerous witnesses whose testimony has been taken. The price of the property is shown to have been ample. His intelligence and capacity are attested by his neighbors and acquaintances, who saw him frequently, did business with him, and had the best opportunities of judging. Eccentric and excited conduct has been shown, and much

has been attempted to be made of the difficulty with a fellow member of the church, which is alleged to have unsettled his mind. To this difficulty great importance has been attached by his wife and some of his family. But I think it manifest from the proofs, that not to that cause, but to their dissatisfaction with the sale, engendering in their minds the notion, and perhaps the honest conviction, of his mental unsoundness, must be attributed the opinions on this subject, which they and some of the witnesses have expressed.

I am of opinion that the defence is unsupported by the evidence, and that the cross-bill should be dismissed with costs.

By a mistake of the complainant as to the true time of payment, he failed to make tender of the principal of the mortgage on the day it fell due, and thereby lost his strict legal rights. His repeated attempts afterwards to make it, were resisted by the defendant and his family. The door of the house was kept locked, entrance denied, and the defendant could not be found. But on or about the 20th of June, 1868, tender was formally made and refused, the defendant saying to the witnesses who offered him the money, that he would not take it; that he did not propose to let Shields have the house; that he had been too sharp for him, and that he wanted to stay in the house where he was. Under these facts, the complainant is entitled to a decree, and to recover his costs of the suit.

The effect of a tender, when lawfully made, is to discharge the debtor from subsequent interest. But to have this effect, the amount tendered must be kept in readiness, and on bill to redeem, or on plea or answer setting up tender, the money must be paid into court. No less strictness is required in such cases in equity, than at law. In *Gyles* v. *Hall*, 2 *P. Wms.* 378, it is laid down, that to entitle the mortgagor to a discharge of interest, it must appear that ever since the tender and refusal he has kept the money ready for paying off the mortgage, and that no profit has been made of it. That the party making the tender must be at all times there-

after *in readiness* to pay, does not appear to be anywhere questioned; but that no use should be made of the money, and no profit derived from it, has been denied. In *Curtiss* v. *Greenbanks,* 24 *Vt.* 536, it was insisted that the tender was of no avail, from the fact that the money paid into court was not the identical money previously tendered, and that to keep a tender good, the identical money offered must be kept ready to be paid over on demand, or at the proper time to be paid into court. This insistment was not sustained. It was held that because the money when tendered and refused does not, as a specific article does, become the property of the person to whom the tender is made, the party making it is at liberty to use it as his own, and that all he is under obligation to do, is to be ready at all times to pay the debt in current money, when requested. The same thing was declared by the Supreme Court of Arkansas, in *Woodruff* v. *Trapnall,* 7 *English* 640. He who tenders, it was said, must hold himself in readiness to pay; but in case of tender before suit, the party makes no deposit, he keeps the money, and may use it if he will, but must hold himself in readiness to pay.

But whatever doubts may exist as to the true meaning of *readiness to pay,* the authorities are agreed, that to stop interest, the money must be paid into court on filing the bill. *De Wolf* v. *Long,* 2 *Gilm.* 679; *Doyle* v. *Teas,* 4 *Scammon* 267; *Jarboe* v. *McAtee,* 7 *B. Monroe* 279; *Taylor* v. *Reed,* 5 *Mon.* 36; *Stockton* v. *Dundee Manufacturing Co., ante* p. 56.

The complainant in this case not having paid the money into court, it is unnecessary to decide how far he is shown by the evidence to have made use of the money tendered, or what the effect of such use would be. He will be charged with the interest from the 1st of April, 1868, at the yearly rent of seven per cent.

The defendant and mortgagee in possession should account for the rents from the same date, upon the terms agreed on by the parties for the year covered by the lease. This will

be the sum of $490 yearly, being the interest on the price for which the property was sold, together with the water rents and taxes, if any, that are due and unpaid. These may be ascertained upon a reference to a master, who will add their amount to the yearly rent aforesaid, and deduct the sum from the amount of $4000, principal and interest, as above. The balance so found to be due to the defendant, should be paid within ninety days from the coming in, or the confirmation of the report.

I respectfully advise a decree in accordance with the above.