198 N.J. Super. 255 (1984)
486 A.2d 1265
ROBERT C. STEWART, SR., PLAINTIFF-RESPONDENT, CROSS-APPELLANT AND CROSS-RESPONDENT,
v.
HARRIS STRUCTURAL STEEL CO., INC., DEFENDANT-APPELLANT, AND CROSS-RESPONDENT, AND WALTER I. HARRIS, DEFENDANT-RESPONDENT, CROSS-RESPONDENT AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 16, 1984.
Decided November 19, 1984.
*257 Before Judges MICHELS, PETRELLA and BAIME.
Robert J. Cirafesi argued the cause for Defendant-Appellant Harris Structural Steel Co., Inc. (Wilentz, Goldman & Spitzer, attorneys; Robert J. Cirafesi, of counsel and on the brief).
Peter D. Manahan argued the cause for Plaintiff-Respondent Robert C. Stewart, Sr. (Connell, Foley & Geiser, attorneys; Peter D. Manahan, of counsel, Peter D. Manahan and Peter J. Smith, on the brief).
Marjorie Gilman Baker argued the cause for Defendant-Respondent Walter I. Harris (Dughi and Hewit, attorneys; Russell L. Hewit, of counsel, Russell L. Hewit and Marjorie Gilman Baker, on the brief).
The opinion of the Court was delivered by MICHELS, P.J.A.D.
*258 Defendant Harris Structural Steel Co., Inc. (Harris Steel) appeals from a judgment of the Law Division which (1) awarded plaintiff Robert C. Stewart, Sr. (Stewart) damages in the sum of $51,097.82  the amount of money earned by Harris Steel on moneys received from Stewart in a voided sale of its voting common stock  plus costs and (2) dismissed its counterclaim against Stewart and crossclaim against defendant Walter I. Harris (Walter). Stewart cross appeals from that portion of the judgment which dismissed his complaint against Walter and Walter cross appeals from the denial of his motion for an involuntary dismissal of Stewart's complaint and Harris Steel's crossclaim. This latter cross appeal was abandoned by counsel at oral argument.
A brief chronology of the events that gave rise to this appeal is helpful to its resolution. Through a series of both corporate and legal maneuvers starting in 1978, two brothers, Thomas Harris (Thomas) and Walter engaged in an intra-family battle against each other to gain control of Harris Steel, a closely held family corporation. Thomas used his own money to ostensibly gain control of Harris Steel by purchasing shares owned by siblings other than Walter. Walter challenged these purchases in the New Jersey courts and although he won a partial victory at the trial level, where the Chancery Division voided one of Thomas' two purchases, we reversed this portion of the judgment, thereby validating all sales to Thomas and in effect confirming Thomas' 52% ownership of Harris Steel voting stock. The day after the New Jersey Supreme Court denied Walter's petition for certification (Harris v. Harris, 85 N.J. 492 (1980)), Walter brought suit in the New York courts, Harris Steel's state of incorporation, in a second attempt to invalidate Thomas' control.
During this same period, at least as early as 1979, Stewart testified that he had been having discussions with both Walter and George Harris (George), Walter's son, concerning the possibility *259 of his [Stewart's] purchasing stock of Harris Steel. Stewart testified that those discussions occurred while he was on business trips with George in both 1979 and 1980. In early 1981, after the New Jersey Supreme Court's denial of the petition for certification and while the New York action was pending, Stewart, Walter and George again discussed Stewart's purchasing stock in the company. These discussions occurred around March 4 or 5, 1981.
On March 3, 1981 Judge Greenfield of the New York Supreme Court, Special Term, rendered judgment validating Thomas' control of Harris Steel. Six days later on March 9, 1981, Walter attempted to hold a Harris Steel Board of Directors meeting. When the New York Supreme Court issued its March 3 judgment, Thomas and his attorney knew of the meeting called for March 9 but elected not to attend. The March 9 meeting was attended by Walter, his wife, George, Walter's daughter Barbara, Stewart and a court reporter. At this meeting Stewart exchanged a cashier's check in the amount of $275,000 for a certificate representing 900 shares of Harris Steel Class A Voting Common Stock, having a par value of $50 per share. Additionally, Stewart, on the one hand, and Walter and George, allegedly as authorized representatives of Harris Steel, on the other, executed a sales agreement to memorialize the terms of the stock sale. Stewart testified that after the sale the meeting was adjourned and he was instructed that it would continue two days later on March 11, 1981 at the offices of Whitman & Ransom, Harris Steel's New York attorneys.
Thomas called a meeting of the Board of Directors for March 11, 1981 at the offices of Whitman & Ransom, at which Stewart, Walter and the latter's wife, son and daughter attended. Stewart testified that although he knew of the friction between the two brothers prior to the March 9 meeting it was at the March 11 meeting that he first learned that Thomas was the controlling stockholder and that the validity of the sale of stock to him was contested.
*260 George J. Noumair (Noumair), the Whitman & Ransom partner in charge of Harris Steel matters, testified that he first learned at the March 11 meeting of the attempted sale of stock to Stewart and that this sale caused Harris Steel to go back into the New York courts to nullify the sale and to affirm Thomas' control of the corporation. After apparently heated discussions between Thomas and Walter and their attorneys, the meeting broke up into two separate meetings, one of the Thomas group and one of the Walter group.
Benjamin M. Polk of Whitman & Ransom, by letter dated March 24, 1981 notified Stewart that it was counsel to Harris Steel, that they took the position that the purported stock sale to him was invalid, that any action taken at the March 9 meeting was ultra vires, and enclosed copies of papers that had been filed in the New York courts to that effect. Stewart handed the letter over to a William W. Lanigan, of Lanigan, O'Connell and Jacobs, who was purportedly acting as New Jersey counsel to Harris Steel and was acting as counsel for Walter regarding the fight for control and had acted as counsel to Stewart in the past. Lanigan replied by letter dated March 28, 1981, informing Whitman & Ransom that as counsel to Harris Steel he had advised Stewart that the March 9 meeting and sale of stock were proper and valid.
On April 30, 1981 Judge Greenfield issued an opinion and order concluding, inter alia, that (1) Thomas was the valid chairman of the Board of Directors of Harris Steel, (2) the rump shareholders meetings on March 9 and 11 called by Walter were invalid, (3) the Board of Directors meeting on March 9, 1981 was invalid, (4) the purported approval of the sale of stock to Stewart was of no force and effect and (5) Thomas was entitled to possession of the corporate books. Whitman & Ransom, by letter dated May 1, 1981 sent a copy of this opinion and order to Stewart who turned the letter and enclosures over to Lanigan.
Noumair received the corporate transfer books on May 4 or 5, 1981 and by letter dated May 6, 1981, Benjamin M. Polk of *261 Whitman & Ransom, demanded Stewart return the certificate representing the 900 Harris Steel common shares within 10 days. The letter of demand made no mention of the $275,000. Again Stewart did not respond to this letter personally, but rather turned it over to Lanigan.
The first offer to return the $275,000 was made by a letter dated June 10, 1981 from Noumair. The letter, in part, read:
As you are fully aware, the New York Supreme Court has held that the attempt to issue that stock to you was null and void and of no force and effect.
While the persons purporting to act on behalf of the company in giving you that certificate had no authority to do so and are personally liable for any consequences of these actions, the Company is nevertheless prepared to return to you the amount of $275,000, which was deposited in its bank account. George Harris and William Keyes have reviewed the matter and it has been confirmed to us today that the sum which you turned over to the company did not represent the company's own funds and, therefore, it appears appropriate to return that amount to you. This would be done without prejudice to any rights the company may have in the event that it turns out upon further review that such funds directly or indirectly represent company funds. Such payment is to be made to you upon a return of the certificates.
Mr. Keyes has indicated that you thought that a greater amount should be returned to you to reflect interest or some other factor. Please be advised that under the court's holding, the transaction was of no force and effect. You were fully familiar with the circumstances surrounding the purported issuance of these shares and the fact that the persons with whom you were dealing were acting at variances with the decisions of the courts of New York and New Jersey.
If you believe you are entitled to any greater amount, we suggest that you look to the persons with whom you dealt rather than the company.
Harris Steel did not tender the return of the moneys it had earned on Stewart's $275,000 up to June 10, 1981. Additionally, according to Noumair, they delayed offering to return the $275,000 until they had conducted a check to insure that it was not Harris Steel money.
Noumair subsequently arranged for and met with Stewart personally on June 21, 1981. At that time he told Stewart he did not believe the stock certificate had any validity, that it was worthless and that he [Stewart] should return the certificate to Harris Steel.
*262 The next significant event occurred on or about October 9, 1981 at a meeting at the Harris Steel plant in Plainfield, New Jersey. This meeting apparently was arranged by Noumair and Robert C. Stewart, Jr., Stewart's son, with whom Noumair had had discussions between June and October 1981 concerning the return of the certificate and the money. William J. Keyes (Keyes), Harris Steel's Comptroller, was directed to have two checks drawn payable to Stewart in anticipation of this meeting. One check was drawn for $275,000. The amount of the second check was left blank, however, Noumair testified that Thomas indicated that the second check was to be made out for $16,000. Neither check was signed. Keyes testified that he understood the amount of the second check was left blank because the parties had not agreed as to the amount of interest and other items to be paid on the check. Although all the events that transpired at the October 9 meeting are not entirely clear, it is abundantly clear that the checks which were originally in Thomas' possession ended up with Walter and were not returned to Keyes to be cancelled until April 6, 1982, and the principal sum of $275,000 and the interest earned thereon were never actually tendered to Stewart.
In May 1982 the New York Appellate Division affirmed Judge Greenfield's original judgment of March 3, 1981, which effectively confirmed Thomas' control of Harris Steel. On July 9, 1982 Stewart and Harris Steel reached and executed an agreement on the exchange of the stock certificate representing the 900 shares of Harris Steel voting stock for $275,000. The agreement reserved to Stewart his rights to pursue a claim for interest on the $275,000 and to Harris Steel the right to a set-off against any interest.
The $275,000 was treated by Harris Steel as cash received from the sale of the capital stock. Initially the funds were placed in Harris Steel's non-interest bearing checking account at United National Bank (United). Subsequently, on April 15, 1981, Keyes, on his own initiative, moved $283,000 from the non-interest bearing account to a United 29-day certificate of *263 deposit. Keyes' stated purpose in moving this money was to earn more interest on the funds. By the time this certificate of deposit became due, Keyes was aware of the conflict over the validity of the sale of the stock to Stewart and therefore placed the return from the original certificate of deposit into short-term certificates of deposit of 5 to 10 days. He did this because, as he testified, there were expectations that Harris Steel was going to have to return the money to Stewart. The last short-term certificate of deposit became due on June 22, 1981. It is apparent from Noumair's letter of June 10, 1981 to Stewart that during this period of time Keyes at least thought that Stewart had requested interest on this money.
On June 23, 1981, two days after Noumair met with Stewart, Keyes transferred $290,000 from Harris Steel's United account to Harris Steel's Citibank non-interest bearing checking account. Keyes testified that this transfer was made after he had been advised that Harris Steel had made an offer to Stewart which Stewart refused and that Keyes had been directed by Noumair to treat the $275,000 generally as corporate funds. Noumair testified that he told Keyes that the funds in the United account "to the extent, any of them represented Stewart money, was [sic] funds of the company."
According to Keyes, once the funds reached the Citibank account they were commingled with the rest of Harris Steel's funds within that account and he had no intent to and made neither an actual nor mental segregation of funds representing Stewart's $275,000. On the contrary, he followed Noumair's advice and treated the funds as corporate funds. However, Keyes admitted that the $290,000 which he transferred to the Citibank account on June 23, 1981 raised the balance in the account to $992,000, and that after payment of payroll, steel and other items the surplus moneys were invested, as was the usual practice, into the interest bearing side of the Citibank account. The surplus funds were usually invested for "many, many weeks" by the purchase of certificates of deposit. In any event, as pointed out by Keyes, when the $290,000 was transferred *264 to the Citibank account on June 23, 1981, Harris Steel "had a surplus of checks that week. If we didn't, we wouldn't have invested." It is thus perfectly clear that Stewart's $275,000 became commingled with Harris Steel corporation funds and can be viewed as used for corporate purposes. It is equally clear that at no time during the period from June 23, 1981 to July, 1982 did the holdings in the Harris Steel interest bearing portion of its Citibank account drop below $800,000. Moreover, as the trial court pointed out in questioning Keyes, from June 23, 1981 until October 9, or thereabouts, Harris Steel had "invested in Citibank, $275,000 more into an interest bearing account than [it] otherwise would, even though it was [commingled] with other corporate funds." The point is, of course, that Harris Steel earned interest on the $275,000 from April 15, 1981 when the funds were first placed in an interest bearing instrument, until July 9, 1982, the date of the Stewart-Harris Steel agreement.
Keyes computed the interest on $275,000 which would have been earned through July 9, 1982 if it had been invested starting on April 15, 1981. This computation assumed $275,000 was invested in the initial 29-day certificate of deposit, the short-term certificates of deposit and reached a point that there was $290,000 to be invested on October 1, 1981. At that point Keyes picked a series of certificates of deposit actually purchased by Harris Steel between October 1, 1981 and July, 1982. Using the rates of these certificates of deposit and compounding the interest which would have been earned on $275,000, the total constructive interest for the period of April 15, 1981 to July, 1982 was $51,097.82  the amount of money that the trial court eventually awarded Stewart.
Stewart instituted this action seeking to recover the $51,097.82 from Harris Steel under theories of (1) constructive trust, (2) implied bailment and (3) unjust enrichment. Harris Steel denied liability and filed a counterclaim against Stewart, seeking to recover damages for Stewart's alleged participation in Walter's unlawful scheme to gain control of the corporation *265 and by his [Stewart's] refusal to return the stock certificate. Stewart then amended the complaint to join Walter as a defendant, claiming Walter breached both expressed and implied warranties of his authority and his agreement to pay him [Stewart] a reasonable return on his investment. Walter denied liability to Stewart and filed a crossclaim against Harris Steel seeking indemnification. Harris Steel in turn filed a crossclaim against Walter seeking to recover any damages that it was found to owe Stewart. At the conclusion of a bench trial, the trial court found that Harris Steel "held [Stewart's] money from March 9, 1981 to July 9, 1982 [and d]uring this time ... earned $51,097.82 on [Stewart's] money." The trial court stated that because of Harris Steel's mistaken "failure to make an unconditional tender of [Stewart's] funds and the retention and use of said funds" it would "impose a constructive trust on [Stewart's] $275,000.00...." The trial court then extended the trust to the interest earned on the corpus of the trust, and specifically found that Stewart's "funds were indeed invested, and [Harris Steel] earned $51,097.82." The trial court thereupon awarded Stewart the $51,097.82 "to restore the status quo giving back to [Stewart] what is rightfully his" and dismissed the remaining claims, counterclaims and crossclaims. This appeal followed.
Harris Steel challenges the imposition of a constructive trust upon the $275,000 paid by Stewart for common stock and the award to Stewart of the interest earned by it on the $275,000. Specifically, Harris Steel argues that the conditioning of the return to Stewart of the $275,000 on his return of the stock certificate was not a wrongful act or a mistake giving rise to the imposition of a constructive trust.
It is fundamental that a constructive trust should "be impressed in any case where to fail to do so will result in an unjust enrichment." D'Ippolito, et al. v. Castoro, et al., 51 N.J. 584, 588 (1968); Hirsch v. Travelers Insurance Company, 134 N.J. Super. 466, 470 (App.Div. 1975). Justice Cardozo recognized this principle in Beatty v. Guggenheim Exploration Co., *266 225 N.Y. 380, 122 N.E. 378, 380 (Ct.App. 1914), when he stated that:
A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.
The Restatement, Restitution § 163 at 661 (1937) explains that "[w]here the owner of property transfers it as a result of a mistake of such a character that he is entitled to restitution, the transferee holds the property upon a constructive trust for him." Section 16 of the Restatement, Restitution at 69 recognizes one type of mistake which entitles a person to restitution as:
A person who has paid money to another because of an erroneous belief induced by a mistake of fact that in so doing he is performing a contract with the other which is not subject to avoidance, is entitled to restitution of the amount so paid if the transaction is voidable by either party because of the mistake and is avoided.
This is in accord with the holding of our Supreme Court that, "[g]enerally all that is required to impose a constructive trust is a finding that there was some wrongful act, usually, though not limited to, fraud, mistake, undue influence ... which has resulted in a transfer of property." D'Ippolito, et al. v. Castoro, et al., 51 N.J. at 589 (emphasis supplied). Moreover, "`[a] constructive trust may arise ... even though the acquisition of the property was not wrongful. It arises where the retention of the property would result in the unjust enrichment of the person retaining it.'" D'Ippolito, et al. v. Castoro, et al., 51 N.J. at 589 (quoting from Scott on Trusts, § 462.2, p. 3417 (3rd ed. 1967)).
In the circumstances of this case, it is perfectly obvious that it would be manifestly unjust to allow Harris Steel to retain the $275,000 and therefore, a constructive trust was properly impressed on the $275,000 in favor of Stewart.
The imposition of such a constructive trust was not precluded by Stewart's conduct in this matter and Harris *267 Steel's arguments to the contrary are clearly without merit. We simply emphasize that the trial court's findings that "there is no indication that Stewart had any prior knowledge of the battle for control between the Harris brothers" is supported by substantial credible evidence on the record as a whole and there is no sound reason or justification for us to disturb it. Leimgruber v. Claridge Assoc. Ltd., 73 N.J. 450, 455-456 (1977); Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 483-484 (1974). For example, Stewart testified he had no knowledge prior to the March 9 meeting that Thomas "had acquired a controlling interest in the corporation." He also testified that when he went into the March 9 meeting he did not know that the issuance of the stock would affect the question of control between Walter and Thomas. Stewart first learned at the March 11 meeting that Thomas was the controlling stockholder and that the validity of the sale of the stock to him was contested. Additionally, Stewart testified that when he received the stock certificate he believed it was "Harris bona fide stock" and that he was unaware that Thomas "had obtained control of the corporation and was responsible for the issuance of stock." Stewart's testimony in this regard stands uncontradicted. Implicit in this testimony and the trial court's finding is the fact that Stewart purchased the Harris Steel stock induced by the mistaken belief that Walter had authority to issue the stock and that in exchanging the $275,000 for the stock certificate he was entering into a valid contract with Harris Steel. The New York Court's holding the stock sale void and of no effect does not negate this conclusion.
The proofs also established beyond dispute that Harris Steel was enriched in the amount of at least $275,000. There cannot be the slightest doubt that it would be unjust and unfair for Harris Steel to retain this money. This money was not Harris Steel's. Harris Steel cannot have it both ways. It cannot argue that the stock certificate was invalid, i.e., that it had not issued stock to Stewart, while at the same time maintaining that the moneys paid for such stock were the corporation's *268 funds to be used as it saw fit. This is exactly what Harris Steel attempted to do here.
Thus, because Stewart mistakenly believed that he had entered into a valid contract to purchase the Harris Steel common stock and that he actually received "Harris bona fide stock" and Harris Steel was unjustly enriched by at least $275,000, the trial court properly impressed a constructive trust on the $275,000 in favor of Stewart. The imposition of such a trust on these funds is consistent with the principle that
There may be a constructive trust where the retention of the property or the beneficial interest would constitute an unconscionable advantage by the holder of the legal title, even though its acquisition was not wrongful. Where the property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity holds him accountable as a trustee. [Stretch v. Watson, 5 N.J. 268, 279 (1959)].
However, the trial court erred in imposing the constructive trust on the basis of Harris Steel's "failure to make an unconditional tender of [Stewart's] funds." The Harris Steel offer to return the funds was conditioned upon the return or surrender by Stewart of the stock certificate. This certificate purported to transfer 900 shares of treasury or capital stock to Stewart and the record indicates that it represented 900 "authorized", i.e., legal, as opposed to "unauthorized," i.e., illegal, shares of stock. The certificate was invalid solely because of irregularities in its issuance.
Significant legal consequences exist in relation to a bona fide purchaser from a corporation depending on whether the stock was "authorized" and merely improperly issued or whether it was completely unauthorized. 11 W. Fletcher, Cyclopedia of the Law of Private Corporations, § 5169 at 294-295 (rev. perm. ed. 1971). As stated in Fletcher:
where there is an inherent lack of power in the corporation to issue the stock, neither the corporation, nor the person to whom the stock is issued, is estopped to question its validity, since an estoppel cannot operate to create stock which, under the law, cannot have existence, and no estoppel can properly arise in any case where the party's direct and affirmative act could not have made the transaction valid. Even under such circumstances, however, the corporation *269 may be liable in damages to a bona fide purchaser or pledgee of the illegal stock. [Id. at 295].
While on the other hand:
where the stock or certificates in question are not inherently void for complete want of corporate power and capacity to issue the stock, the corporation cannot take advantage of technical irregularities in issuing stock in order to deny to its holders the rights of stockholders, where it has expressly acquiesced in and recognized their rights for a long period of time, and no rights of third persons have intervened. And the corporation and its officers are estopped to deny the validity of the stock or certificates as against bona fide purchasers or pledgees on the ground of irregularities or informalities in the issuance or execution of the stock or certificates. [Id. at 294; emphasis supplied].
In light of these principles, Harris Steel was correct in not tendering the $275,000 without receipt of the certificate. Because the certificate represented "authorized" voting stock of the corporation, Harris Steel faced not only the possibility of a claim for damages by a bona fide purchaser but, more threatening, the real possibility of an unwanted stockholder with the ability to tip the balance of corporate control. In this respect Stewart's argument that the stock was worthless or that he would have some responsibility to Harris Steel in the event he sold the certificate to a bona fide purchaser is substantially undercut. Although the possibility of a bona fide purchaser actually materializing may have been remote, Stewart's failure to even confirm that he still possessed the certificate gives weight to the position that Harris Steel's release of the funds conditioned on the return of the stock certificate was not legally wrong, and therefore cannot be viewed as a wrongful act which gave rise to the constructive trust.
The question remains whether Stewart is entitled to the return of more than the $275,000. In this respect the trial court was correct in holding Harris Steel liable for the $51,097.82 interest actually earned by it on Stewart's funds. As stated in Brown v. Home Development Co., 129 N.J. Eq. 172, 177 (Ch. 1941):
At common law it has been said, there were no circumstances under which interest could be claimed as a matter of right. According to the modern view, *270 however, there are many circumstances when interest "goes with the principal as the fruit with the tree." Interest should be allowed where the conduct of a party merits its allowance against him as for some misconduct, breach of trust, or dereliction of duty, or where the person retains funds belonging to another actually making interest thereon. [Emphasis supplied].
Or, as somewhat more recently stated by our Supreme Court, "[i]n equity, interest has been allowed `either by way of damages for the detention of a fund, or by way of profit earned or advantage attained.'" Consolidated Police & Firemen's Pension Fund Comm. v. Passaic, 23 N.J. 645, 652 (1957) (Emphasis supplied; quoting Stout v. Sutphen, 132 N.J. Eq. 583, 590 (Ch. 1943), and citing Brown v. Home Development Co., 129 N.J. Eq. 172); See also Kamens v. Fortugno, et al., 108 N.J. Super. 544, 548 (Ch.Div. 1970).
The trial court found that Stewart's "funds were indeed invested and the Company earned $51,097.82 [and that this figure] represent[ed] the actual sum earned by the Company on [Stewart's] money from March 10, 1981 to July 9, 1982." As money actually earned or an advantage attained by Harris Steel in retaining Stewart's money, Harris Steel is liable to him for this amount. Consolidated Police & Firemen's Pension Fund Comm. v. Passaic, 23 N.J. at 652. This is in keeping with the principles established by the Restatement, Restitution, § 163.
Harris Steel argues, citing Restatement, Restitution § 177, that because Stewart refused to return the certificate, "Stewart cannot now seek to impose upon [it], an involuntary custodian of the funds, the same constructive duty and liability as would be imposed upon one who affirmatively and wrongfully refused to return the funds." While this generally is true, it demonstrates Harris Steel's misunderstanding of the basis for awarding Stewart the $51,097.82.
Harris Steel cannot deny it was under a duty to make restitution of the $275,000 to Stewart. It was Harris Steel, albeit derivatively as represented by Thomas, that went into the New York courts for the express purpose and with the effect of having the sale of stock to Stewart declared of no force and *271 effect. Once the sale was declared null and void Harris Steel was under a duty to return that which it had received for the invalid certificate. Stated simply, there was a failure of consideration on the part of Harris Steel. Under such duty Harris Steel became liable not only for the $275,000 but for the profit derived from the funds. Thus, Harris Steel was under a duty not only to return the $275,000 but also the $51,097.82 interest actually earned from it.
Contrary to Harris Steel's argument, its liability is not limited to the amount of interest that had accrued as of June 10, 1981  the date when it first proposed the return of Stewart's $275,000. This alleged tender was not sufficient to discharge Harris Steel's obligation to turn over to Stewart the moneys that it actually earned on the $275,000. In order for a tender to discharge a debtor's obligation for subsequent interest, the tender must not only include the return of the principal, but also the interest earned to the date of the tender. See Sun Shipbuilding & Dry Dock Co. v. United States Lines, Inc., 439 F. Supp. 671 (E.D.Pa. 1977), aff'd, 582 F.2d 1276 (3rd Cir.1978), cert. den., 439 U.S. 1073, 99 S.Ct. 846, 59 L.Ed.2d 40 (1979). See also, Shields v. Lozear, 22 N.J. Eq. 447, 451-452 (Ch. 1871), aff'd 23 N.J. Eq. 509 (E. & A. 1872). Harris Steel failed to do that here. It merely offered Stewart the return of his principal, not the money that had been earned on that sum up to the date of the offer.
Finally, we hold that the trial court did not err in dismissing Harris Steel's crossclaim against Walter for indemnification for any judgment recovered against it by Stewart. Walter was an officer of Harris Steel at the time of the attempted sale of stock to Stewart. As such he stood in a fiduciary relation with Harris Steel because "there is no doubt that, at least in their dealings with the corporation and its assets, officers and directors are quasi-trustees...." Judson v. Peoples Bank & Trust Co., 25 N.J. 17, 28 (1957). And his acts as an officer may lead to his liability. Id.; Hirsch v. *272 Phily, 4 N.J. 408, 416 (1950); McGlynn v. Schultz, 95 N.J. Super. 412, 416 (App.Div. 1967), certif. den. 50 N.J. 409 (1967).
Harris Steel initially sought by way of crossclaim to be indemnified for any and all claims, judgments, costs and legal fees incurred by it as a result of any judgment entered in favor of Stewart. However, on appeal, Harris Steel has limited its claim for indemnification to "any damages this Court may assess against the company." Thus, while Walter may have breached some fiduciary duty owing to Harris Steel by reason of his conduct in the attempted sale of stock to Stewart, Harris Steel did not sustain any damages. Harris Steel is not entitled to be indemnified for the $51,097.82 it has been compelled to pay Stewart because those moneys cannot fairly be considered as damages. The trial court did not award Stewart damages as we ordinarily understand that term. Moreover, the award was not punitive in nature or made to compensate Stewart for the loss that the moneys due him presumably would have earned if payment had not been delayed. Rather, the award was simply to return the parties to the status quo and place them in the same position each would have been in without loss to either by requiring Harris Steel to turn over to Stewart the actual moneys earned on Stewart's funds  no more, no less.
Accordingly, the judgment under review is affirmed.