In re FIRST INTERREGIONAL
ADVISORS CORPORATION,
Debtor.

WARNOCK AUTOMOTIVE GROUP,
INC., Plaintiff,

v.

Harrison J. GOLDIN, Chapter 11 Trustee for First Interregional Advisors Corp.; First Interregional Advisors Corp.; Township of Mt. Laurel; School District of the Chathams; Borough of North Catasauqua; Township of Wilkes–Barre; and John Does X,Y, and Z, Defendants.

Bankruptcy No. 97–22513.
Adversary No. 97–2312.

United States Bankruptcy Court,
D. New Jersey.

Oct. 29, 1997.

Wolff & Sampson, P.C. by Robert E. Nies, Roseland, NJ, for Plaintiff.

Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, P.A. by Jack M. Zackin, Patricia Brown Fugee, Newark, NJ, for Harrison J. Goldin, Chapter 11 Trustee.

### OPINION

ROSEMARY GAMBARDELLA,
Bankruptcy Judge.

### I. MATTER BEFORE THE COURT

Before this Court are two motions for summary judgment. Plaintiff Warnock Automo-

tive Group, Inc. ("Warnock") moves for summary judgment against the Chapter 11 Trustee and the estate of the Debtor/First Interregional Advisors Corp. ("FIAC") and for entry of an order imposing a constructive trust against FIAC. Warnock argues that a constructive trust should be imposed on the lease payments for the vehicles sold to the Government Entities in favor of Warnock to prevent FIAC's estate and creditors from being unjustly enriched. Warnock, by the present motion for summary judgment, requests that this Court: (1) void FIAC's lease agreements with the Government Entities; (2) direct the Trustee to execute all necessary documents to remove FIAC's putative liens on the vehicles; and (3) authorize the Government Entities to make their lease payments to Warnock or to such third-party financing companies as Warnock may designate with consent of the Government Entities.

The Trustee of FIAC, however, contends that Warnock is not entitled to the lease payments because the payments are property of the bankrupt estate. The Trustee submits that but for the filing of Chapter 11, FIAC would have paid the purchase price to Warnock for each of the vehicles. Thus, the Trustee requests that this Court enter summary judgment in favor of the Trustee and the FIAC estate dismissing all counts of the Complaint; and an Order declaring: (1) that the leases with the Municipalities are property of the estate; (2) that Warnock does not have the right to the leases or the rental payments, and (3) that Warnock is merely a general unsecured creditor of the estate.

A hearing was conducted on September 4, 1997. The following represents this Court's findings of fact and conclusions of law.

## II. STATEMENT OF FACTS

### A. Background

FIAC filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") on March 5, 1997. The Trustee, Harrison J. Goldin, was appointed as a Chapter 11 Trustee on March 14, 1997.

### B. FIAC's Business Operations

FIAC was engaged in the business of financing equipment leases in which federal, state and municipal government entities are generally the lessees. In the course of its business operations, FIAC entered into master financing agreements and/or master lease agreements ("Master Agreements") with manufacturers/dealers of office equipment and automobiles. The Master Agreements established a mechanism for the acquisition of leases and set forth the respective rights and obligations of the parties in regards to the sale and/or transfer of leases and equipment. (Certification of Kimberlee Pomana, ¶ 2).

Under the Master Agreements, if FIAC acquired a lease it would pay the manufacturer or dealer a lump sum for title to the equipment or vehicle and the stream of income due under the lease or instrument. FIAC received full and clear title to the equipment and was assigned all rights to receive monthly lease payments. (Pomana Cert. at ¶ 3).

Upon FIAC's acquisition of lease and title to the equipment, the lessee would be directed to send its monthly payments to a post office box maintained by FIAC. Following its acquisition of the leases, FIAC would then "sell" or "assign" the lease to its customers. (Pomana Cert. at ¶¶ 4, 5).

### C. Transactions with Warnock Automotive Group, Inc.

In 1994, FIAC entered into a Master Financing Agreement (the "Warnock Agreement") with Warnock Automotive Group, Inc. ("Warnock" or "Plaintiff"). Similar to FIAC's other Master Financing Agreements, the Warnock Agreement provided in the "Whereas" clauses that FIAC intended to finance Warnock Leases, that Warnock may but was not obligated to provide lease financing business to FIAC, and that FIAC may but was not obligated to finance the leases. See Warnock Agreement, Whereas ¶¶ 2, 3, 4, & 5. Paragraph 1 as to "Purchase and Assignment" provided that Warnock may sell equipment to FIAC, subject to the leases, and that Warnock would assign its rights to

receive lease payments to FIAC. (Pomana Cert. at ¶ 6).

The Warnock Agreement also provided that Warnock would deliver certain documentation to FIAC and if FIAC agreed to finance the transaction, then it had a conditional obligation to fund such transaction contingent upon receipt and review of the final documents. *See* Warnock Agreement, ¶ 2. Following receipt, FIAC was obligated to wire transfer the purchase price within five working days. *See id.* Moreover, the Warnock Agreement provided that FIAC assumed the risks associated with termination by any lessee for convenience of the government/lessee, non-appropriation of funds, or non-renewal. *See* Warnock Agreement, ¶ 10. (Pomana Cert. at ¶ 7, 8).

In accordance with the Warnock Agreement, Warnock and FIAC engaged in numerous financing transactions. Customarily, the transaction would be initiated by the municipality and Warnock reaching agreement on terms for the lease of a vehicle. Warnock would then transmit a Transaction Summary Worksheet to FIAC outlining the agreement and inviting FIAC to purchase the lease transaction. If FIAC was interested, it prepared a FIAC Purchase Order for the vehicle. FIAC would then send the Purchase Order to Warnock and a FIAC Municipal Lease, a FIAC Delivery, Installation and Acceptance ("DIA") along with certain other tax documentation to the municipality. (Pomana Cert. at ¶ 9).

Once FIAC received the executed lease, the executed tax documentation, and a Purchase Order from the municipality, FIAC would send the documents to Warnock with a vehicle release authorization form outlining the remaining documentation necessary before payment would be made. Warnock would then deliver the vehicle to the municipality with a certificate of origin and an assignment thereof. Title to the vehicle was also transferred to the municipality and FIAC was listed as its secured creditor. Upon delivery of the vehicle, Warnock would obtain the DIA, which it would send to FIAC. Upon FIAC's receipt of the DIA and any remaining documentation required by the Warnock Agreement, FIAC would tele-

phone the municipality to verify receipt of the vehicle and to ensure it was in proper condition. FIAC would then wire transfer the purchase price to Warnock. (Pomana Cert. at ¶¶ 9, 10, 11).

During the course of the relationship between FIAC and Warnock, FIAC acquired approximately 122 leases, many of which utilized these procedures. Although the Warnock Agreement provided for payment within five days of delivery of the documents, FIAC often did not make the wire transfer for several weeks. (Pomana Cert. at ¶ 12).

According to documentation there were several transactions that occurred immediately prior to the filing of the Chapter 11 petition. Specifically, on or about January 21, 1997, Warnock sold and delivered a 1996 Chevy Caprice Police Package Vehicle (the "Chevy Caprice") to North Catasauqua, a municipality of the Commonwealth of Pennsylvania. *See* Emil Giordano Aff., ¶ 2. In reliance upon FIAC's promise to finance the purchase price of the Chevy Caprice, the title was transferred from Warnock to North Catasauqua. *See* Stip., ¶ 10(f). After this sale, FIAC failed to finance the purchase price of the Chevy Caprice. *See* Stip., ¶ 5. In reaction to FIAC's failure to pay, North Catasauqua withheld its first semi-annual lease payment to FIAC. *See* Giordano Aff., ¶ 7. Warnock submits that North Catasauqua has an outstanding balance of $19,361.44, plus interest and costs owed on the Chevy Caprice.

On or about February 13, 1997, Warnock sold and delivered a 1997 Municipal Ford Crown Victoria to the Township of Wilkes ("Wilkes–Barre"), a municipality of the Commonwealth of Pennsylvania. (William Turinsky Aff., ¶ 4). Title was transferred, in reliance of FIAC's promise to finance, from Warnock to Wilkes–Barre and a lien was created in favor of FIAC. *See* Stip., ¶¶ 12(f) & (j). Because of FIAC's failure to finance the sale, Wilkes–Barre withheld its first monthly lease payment. (Turinsky Aff., ¶ 7). Warnock contends that Wilkes–Barre has an outstanding balance of $21,225.00, plus interest and costs.

On or about February 21, 1997, Warnock sold and delivered a 1997 Ford F250 Pick-up truck to the School District of the Chathams, Chatham, New Jersey ("Chatham"). *See* Vincent Yaniro Aff., ¶ 4. In reliance on FIAC's promise to finance the transaction, the title of the Pick-up was transferred from Warnock to Chatham and a lien was entered in favor of FIAC. *See* Stip., ¶ 8(f). Chatham made the first annual payment of $9,685.52 to FIAC. FIAC failed, however, to finance the sale. *See* Stip., ¶ 5. Therefore, Warnock contends that it is owed $26,383.00 from Chatham for the Pick-up, plus costs and interest.

The final sale occurred on or about February 28, 1997. Warnock delivered and sold four Dodge Intrepid four-door sedans (the "Dodge Intrepids") to the Township of Mt. Laurel, New Jersey ("Mt. Laurel"). (Barbara Krumpe Aff., ¶¶ 2 & 4). The titles to the Dodge Intrepids were transferred in reliance of FIAC's promise to finance and liens were created in favor of FIAC. (Krumpe Aff., ¶ 4). FIAC failed to finance the purchase price of the Dodge Intrepids, and Mt. Laurel withheld its first semiannual lease payment to FIAC. *See* Stip., ¶ 5. Warnock submits that Mt. Laurel has an outstanding balance of $66,152.00, plus interest and costs owed on the Dodge Intrepids.

As reflected by the documentation, each of the transactions were substantially complete at the time of the filing of the bankruptcy petition. Specifically, both the North Catasauqua and the Chatham transactions were fully documented and FIAC had prepared the documentation for the wire transfer. The Wilkes–Barre transaction was fully documented as well, but during the phone verification (around February 21, 1997), the municipality requested that FIAC call back in two weeks when the vehicle was on the road. Finally, the Mt. Laurel Transaction was completed but for FIAC's receipt from Mt. Laurel of the executed DIAs. Hence, with respect to all of the named transactions at the time of the intervening Chapter 11 filing, FIAC and Warnock had performed all of the steps required of them to complete the transactions with the exception of the payment to Warnock. (Pomana Cert. at ¶ 14).

On May 6, 1997, Warnock filed the present Verified Complaint to Compel Turnover of Property that is not Estate Property, to Impose and Enforce Constructive Trust and for Declaratory and Injunctive Relief.

By the First Count of the Complaint, Warnock seeks a declaration that Warnock is the equitable owner of any liens in and to the Motor Vehicles and that neither the Trustee nor Debtor's estate has any interest in and to the Motor Vehicles or proceeds paid or to be paid in accordance thereof.

By the Second Count of the Complaint, Warnock seeks imposition and enforcement of a constructive trust against FIAC's putative liens to the Motor Vehicles, identifiable proceeds paid by government entities to FIAC and identifiable proceeds held by government entities which have not yet been paid to FIAC.

By the Third Count of the Complaint, Warnock requests injunctive relief enjoining FIAC from exercising any rights as a lien-holder of the Motor Vehicles or treating its putative liens or payments from government entities as property of the estate.

By the Fourth Count, Warnock alleges that the acts of FIAC constitute willful conversion of Warnock property and seeks judgment (a) declaring the Debtor's legal title to putative liens in and to the Motor Vehicles and proceeds to be paid *not* property of the estate; (b) compelling the Trustee to take action to convey to Warnock or its designee the Debtor's legal title to the liens in and to the vehicles; (c) imposing and enforcing a constructive trust against the Debtor's legal title to putative liens in and to the vehicles and payments; (d) authorizing the government entities to pay to Warnock payments for the Motor Vehicles or enter into additional financial arrangements directly with Warnock; (e) enjoining the Trustee, Debtor and its agents from transferring or otherwise disposing of FIAC's putative liens against the Motor Vehicles or proceeds paid by the government entities; and (f) enjoining the government entities from making further payments to the Trustee or Debtor in consideration of payment for the Motor Vehicles.

On June 9, 1997, the Chapter 11 Trustee for FIAC filed an Answer to the Verified Complaint. By the Answer, the Trustee raises defenses that: (1) the Complaint fails to state a claim upon which relief can be granted; (2) Warnock transferred any and all interests it had in the vehicles and leases and so its claim, if any, is a general unsecured claim against the FIAC estate; (3) as a general unsecured creditor, Warnock does not have standing or the right to compel the Trustee to turn over the vehicles or any payments related to the leases; and (4) Warnock's rights to the property and an accounting are limited to the distribution, if any, ultimately made at the conclusion of the case.

By the Answer, the Trustee seeks judgment denying all the relief requested in the Verified Complaint.

## III. DISCUSSION

### A. Summary Judgment Standard

"If the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[,]" summary judgment shall be granted. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The Supreme Court has explained that Rule 56(c) requires "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Therefore, "a motion for summary judgment must be granted unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987) (citations omitted). In considering a motion for summary judgment, the evidence must be considered in the light most favorable to the non-

moving party. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)(quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). However, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Therefore, "[i]f the evidence [offered by the non-moving party] is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511 (citation omitted). On the other hand, if reasonable minds can differ as to the import of proffered evidence that speaks to an issue of material fact, summary judgment should not be granted.

## IV. THE LEASE IS A FINANCE LEASE AS DEFINED BY NJ UCC § 12:2A–103(g).

### A. Definition

At the outset, it is important to recognize that the lease in this transaction is a finance lease as defined under the New Jersey Uniform Commercial Code ("NJ UCC"). The New Jersey UCC provides:

(g) "Finance Lease" means a lease with respect to which:

(i) the lessor does not select, manufacture, or supply the goods;

(ii) the lessor acquires the goods or the right to possession and use of the goods in connection with the lease; and

(iii) one of the following occurs:

(A) the lessee receives a copy of the contract by which the lessor acquired the goods or the right to possession and use of the goods before signing the lease contract;

(B) the lessee's approval of the contract by which the lessor acquired the goods or the right to possession and use of the goods is a condition to effectiveness of the lease contract;

(C) the lessee, before signing the lease contract, receives an accurate and complete statement designating

the promises and warranties, and any disclaimers of warranties, limitations or modifications of remedies, or liquidated damages, including those of a third party, such as the manufacturer of the goods, provided to the lessor by the person supplying the goods in connection with or as part of the contract by which the lessor acquired the goods or the right to possession and use of the goods; or

(D) if the lease is not a consumer lease, the lessor, before the lessee signs the lease contract, informs the lessee in writing (a) of the identity of the person supplying the goods to the lessor, unless the lessee has selected that person and directed the lessor to acquire the goods or the right to possession and use of the goods from that person, (b) that the lessee is entitled under this chapter to the promises and warranties, including those of any third party, provided to the lessor by the person supplying the goods in connection with or as part of the contract by which the lessor acquired the goods or the right to possession and use of the goods, and (c) that the lessee may communicate with the person supplying the goods to the lessor and receive an accurate and complete statement of those promises and warranties, including any disclaimers and limitations of them or of remedies.

N.J.S.A. 12A:2A–103(g) (West Supp.1997).

Moreover, Comment (g) to NJ UCC § 2A–103 is instructive and states:

Due to the limited function usually performed by the lessor, the lessee looks almost entirely to the supplier for representations, covenants and warranties. If a manufacturer's warranty carries through, the lessee may look to that. Yet, this definition does not restrict the lessor's function solely to the supply of funds; if the lessor undertakes or performs other functions, express warranties, covenants and the common law will protect the lessee.

N.J.S.A. 12A:2A–103, Comment (g) (West Supp.1997).

## B. Analysis

■ It is clear from the documentation provided that all of the necessary requirements under the definition of a commercial finance lease have been satisfied. *See generally Financing for Science Int'l, Inc. v. A.C. Trams, Inc.*, 1994 WL 705422 (D.N.J.1994). First, FIAC did not select, manufacture, or supply the lease equipment; hence, (g)(i) is met. Second, FIAC acquired the goods in connection with the lease through its lease with Warnock and, therefore, (g)(ii) is satisfied. *See* Warnock Agreement. Third, in the lease between FIAC and the Government Entities, the identity of the person supplying the goods, Warnock, is identified on the lease agreement, *see* Municipal Leases; there is also a paragraph in the respective municipal leases specifying that the Government Entities were made aware that "the lessor makes no representation or warranty of any kind" and further that "any claims relative to the equipment shall be made solely against the manufacturer of other warrantor." *See* Municipal Leases, p. 2 ¶ 6.

In this case, FIAC merely provided the Government Entities with financing for the vehicles. FIAC performed no other function and prominently disclaimed all representations and warranties in their lease with the Government Entities. Hence, the final prong, (g)(iii)(D), is fulfilled. Therefore, in the instant case, the lease is a commercial finance agreement as defined under the NJ UCC.

The FIAC Trustee argues that Warnock effectively assigned the leases to FIAC under the relevant NJ UCC provisions and that Warnock has no right to the lease payments. Although this Court agrees that Warnock has no right to the lease payments, the argument set forth by the FIAC Trustee is inapposite because the transaction in this case is a commercial finance lease, as described above. Therefore, while the leases are governed by the provisions of Article 2A of the UCC, *see* N.J.S.A. 12A:2A–101 et seq., the lease in this case is specifically provided for under the UCC's finance lease provisions, rather than the Article 9 provisions cited by the FIAC Trustee. Additionally, because

this Court finds that the FIAC estate is entitled to the lease payments under the NJ UCC, this Court need not address the FIAC Trustee's arguments regarding Warnock's transfer of title under New Jersey law.

**V. Warnock is not entitled to lease payments from the Government Entities because under § 12A:2A–407 the Entities are obligated to FIAC.**

**A. Definition**

Because the lease was a finance lease, the promises under the respective contracts between FIAC and the Government Entities became irrevocable upon the lessee acceptance of the goods. Section 12A:2A–407 provides in pertinent part:

(1) In the case of a finance lease that is not a consumer lease the lessee's promises under the lease contract become irrevocable and independent upon the lessee's acceptance of the goods.

(2) A promise that has become irrevocable and independent under subsection (1):

(a) is effective and enforceable between the parties, and by or against third parties including assignees of the parties, and

(b) is not subject to cancellation, termination, modification, repudiation, excuse, or substitution without the consent of the party to whom the promise runs.

(3) This section does not affect the validity under any law of a covenant in any lease contract making the lessee's promises irrevocable and independent upon the lessee's acceptance of the goods.

The official Uniform Commercial Code comment explains:

This section extends the benefits of the classic "hell or high water" clause to a finance lease that is not a consumer lease. This section is self-executing; no special provision need be added to the contract. This section makes covenants in a finance lease irrevocable and independent due to the function of the finance lessor in a three party relationship: the lessee is looking to the supplier to perform the essential covenants

and warranties. *See* § 2A–209. Thus, upon the lessee's acceptance of the goods the lessee's promises to the lessor under the lease contract become irrevocable and independent.

**B. Analysis**

■ Because the Government entities accepted the vehicles, they each have a legal duty to pay FIAC regardless of the issues that arise between FIAC and Warnock. Thus, Warnock is in no way entitled to the lease payments from the Government Entities. At most, Warnock would be entitled to make a breach of contract claim against FIAC.

■ Warnock argues that if this Court finds that a contract claim exists, then FIAC must cure their defaults, under § 365 of the Bankruptcy Code, before they can receive lease payments. Section 365(b)(1) provides, *inter alia,*:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract of lease.

Warnock's argument, however, is unpersuasive as the Third Circuit explains:

"In cases where the nonbankrupt party has fully performed, it makes no sense to talk about assumption or rejection. At that point only a liability exists for the debtor—a simple claim held by the nonbankrupt against the estate—and 'the estate has whatever benefit it can obtain from the other party's performance and

the trustee's rejection would neither add to nor detract from the creditor's claim or the estate's liability.' Rejection is meaningless in this context, and assumption would be of no benefit to the estate, serving only to convert the nonbankrupt's claim into a first priority expense of the estate at the expense of the other creditors."

See In re Columbia Gas Sys., Inc., 50 F.3d 233, 239 (3d Cir.1995) (citations omitted).

In this case, Warnock has fully performed. Therefore, the most an assumption could do for Warnock is possibly elevate their claim to an administrative expense priority, which would allow Warnock priority over all pre-bankruptcy claims of creditors. Such an action of assumption by FIAC, however, would offend "the general policy of the bankruptcy laws [which] is equality of distribution among all creditors..." See id. at n. 9 (citation omitted). Therefore, Warnock's § 365 argument is unfounded and at most Warnock is entitled to, as the Third Circuit describes, a "simple claim against the bankrupt's estate." Warnock relied, to their detriment, on FIAC's solvency when they entered into the Warnock Agreement. In hindsight, Warnock failed to adequately protect themselves from the possibility of FIAC's insolvency.

## VI. Warnock's argument to impose a constructive trust is unfounded.

▇ Warnock argues that a constructive trust should be imposed against the lease payments as the FIAC estate will be unjustly enriched upon receipt of the lease payments without remitting the purchase price of the vehicles to Warnock. Section 541(a) of the Bankruptcy Code provides, inter alia, that:

(A) [t]he commencement of a case under section 301, 302, or 303 of this title created an estate...comprised of all...legal or equitable interests of the debtor.

11 U.S.C. § 541(a). Section 541(d) of the Bankruptcy Code "exempts specific interests from a debtor's estate." See In re Columbia Gas Sys., Inc., 997 F.2d 1039, 1059 (3d Cir. 1993). Specifically, § 541(d) provides in pertinent part:

Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest...becomes property of the estate under subsec-

tion (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d). Congress intended § 541(d) to exclude property subject to a trust. See Columbia Gas Sys., Inc., 997 F.2d at 1059 ("A trustee has no equitable interest in funds it holds in trust. Indeed that is the classic definition of a trust—the beneficiary has an equitable interest in the trust property while legal title is vested in the trustee.")

In this case, if FIAC is converted into a trustee by the imposition of a constructive trust, then FIAC would hold only legal title to the property. Under § 541(d) bare legal title is insufficient for the property to come within the bankruptcy estate. See United States v. Whiting Pools, Inc., 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983). Thus, through the imposition of a constructive trust, FIAC would retain legal title but the constructive trust beneficiary, Warnock, could reclaim in full its equitable interests.

In opposition, the Trustee contends that a constructive trust is inappropriate because Warnock has failed to demonstrate either unjust enrichment or wrongful conduct on the part of FIAC. This Court agrees.

▇ According to prevailing law, the essential ingredient for the imposition of a constructive trust is unjust enrichment. See Stewart v. Harris Structural Steel Co., Inc., 198 N.J.Super. 255, 265, 486 A.2d 1265 (App. Div.1984). Moreover, "it is also well settled in New Jersey that all that is required to impose a constructive trust is a finding that there was some wrongful act, usually, though not limited to fraud, mistake, undue influence...which has resulted in a transfer of property." In re Delauro, 207 B.R. 412, 415 (Bankr.D.N.J.1997) citing D'Ippolito v. Castoro, 51 N.J. 584, 589, 242 A.2d 617 (1968). A constructive trust may arise even though the acquisition of the property was not wrongful where the retention of the property results in an unjust enrichment of the person retaining it. See D'Ippolito v. Castoro, 51 N.J. at 589, 242 A.2d 617. Therefore, in

order for this Court to impress a constructive trust on the property in question, Warnock must demonstrate that FIAC's receipt of lease payments constitute unjust enrichment or that FIAC committed a wrong act in acquiring the property.

 Unjust enrichment "occurs when [an individual] retains money or benefits which in justice and equity belong to another." BLACK'S LAW DICTIONARY 1535 (6th ed.1990). Warnock submits that the FIAC estate would be unjustly enriched by receipt of the lease payments because FIAC failed to finance the vehicles. These lease payments, however, are monies that belong to the FIAC estate pursuant to the Warnock Agreement. Thus, FIAC's failure to finance the vehicles is a breach of the Warnock Agreement, not unjust enrichment. *See Presten v. Sailer,* 225 N.J.Super. 178, 195, 542 A.2d 7 (App.Div. 1988) (holding that a breach of contract alone is insufficient to support the imposition of a constructive trust).

Likewise, FIAC did not engage in any unfair or wrongful conduct in causing Warnock to deliver the vehicles and transfer the lease rights to FIAC. Pursuant to the documentation, these dealings were handled no differently than the transactions that took place between the parties pre-petition, with the exception that FIAC had not yet completed the payment process before the intervening bankruptcy. Hence, FIAC did not engage in any wrongful conduct necessary that would support a constructive trust.

This Court finds that the Government Entity leases are property of the estate as described by 11 U.S.C. § 541 and, further, that Warnock has no right to the leases or the rental payments because Warnock is a general unsecured creditor of the FIAC estate. Accordingly, Warnock's motion for summary judgment is denied in its entirety, and the Trustee's request for summary judgment is granted.

## VII. CONCLUSION

For the reasons outline above, this Court will DENY Warnock's motion in its entirety and GRANT the Trustee's motion for Summary Judgement on all counts, and dismiss all counts of the Complaint.

An Order in accordance with this Court's decision shall be submitted.